UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
EVAN BROWN,                                  :
                                             :   Case No.:  1:19-cv-03984
                        Plaintiff,           :
                                             :   **COMPLAINT**
        -against-                            :
                                             :   **DEMAND FOR JURY TRIAL**
PAPA MURPHY'S HOLDINGS INC., JEAN            :
M. BIRCH, WELDON SPANGLER, NOAH A.           :
ELBOGEN, BENJAMIN HOCHBERG, YOO              :
JIN KIM, ALEXANDER C. MATINA,                :
DAVID MOUNTS, JOHN SHAFER,                   :
KATHERINE L. SCHERPING, and ROB              :
WEISBERG,                                    :
                                             :
                        Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Evan Brown ("Plaintiff"), by and through his attorneys, alleges the following upon

information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Papa Murphy's Holdings Inc. ("Papa

Murphy's" or the "Company") and the members of the Company's board of directors (collectively

referred to as the "Board" or the "Individual Defendants" and, together with Papa Murphy's, the

"Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United

States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule

14d-9").  Plaintiff's claims arise in connection with the proposed tender offer ("Tender Offer") by

MTY Food Group Inc., through its subsidiaries (collectively "MTY"), to acquire all of the issued

and outstanding shares of Papa Murphy's (the "Proposed Transaction").

2.      On April 10, 2019, Papa Murphy's entered into an agreement and plan of merger (the "Merger Agreement"), whereby shareholders of Papa Murphy's common stock will receive $6.45 in cash for each share of Papa Murphy's stock they own (the "Offer Price").

3.      On April 25, 2019, in order to convince Papa Murphy's shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"). In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the valuation analyses performed by the Company's financial advisor, North Point Advisors LLC ("North Point"); and (iii) the background of the offer.

4.      The Tender Offer is scheduled to expire at one minute after 11:59 p.m. (12:00 midnight), New York City time, on May 22, 2019 (the "Expiration Date"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed determination on whether to tender their shares.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Papa Murphy's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act.

7.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

8.    Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Papa Murphy's common stock trades on the Nasdaq stock exchange, which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## **PARTIES**

9.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Papa Murphy's common stock.

10.    Defendant Papa Murphy's is a Delaware corporation and maintains its principal executive office at 8000 NE Parkway Drive, Suite 350, Vancouver, Washington, 98662. Papa

Murphy's is a franchisor and operator of the largest Take 'n' Bake pizza brand and the 5th largest pizza chain in the United States, selling pizzas ready for customers to bake at home. The Company's common stock trades on the Nasdaq under the ticker symbol "FRSH".

11.    Individual Defendant Jean M. Birch is a director of Papa Murphy's and is the Chairman of the Board.

12.    Individual Defendant Weldon Spangler is a director of Papa Murphy's and is the Chief Executive Officer of the Company.

13.    Individual Defendant Noah A. Elbogen is, and has been at all relevant times, a director of the Company.

14.    Individual Defendant Benjamin Hochberg is, and has been at all relevant times, a director of the Company.

15.    Individual Defendant Yoo Jin Kim is, and has been at all relevant times, a director of the Company.

16.    Individual Defendant Alexander C. Matina is, and has been at all relevant times, a director of the Company.

17.    Individual Defendant David Mounts is, and has been at all relevant times, a director of the Company.

18.    Individual Defendant John Shafer is, and has been at all relevant times, a director of the Company.

19.    Individual Defendant Katherine L. Scherping is, and has been at all relevant times, a director of the Company.

20.    Individual Defendant Rob Weisberg is, and has been at all relevant times, a director of the Company.

21.     The defendants identified in paragraphs 10-20 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.     Background of the Company and the Tender Offer

22.     Papa Murphy's, incorporated on March 29, 2010, is a holding company. The Company, together with its subsidiaries, is a franchisor and operator of the Take 'N' Bake pizza chain in the United States. The Company franchises the right to operate Take 'N' Bake pizza franchises and operates Take 'N' Bake pizza stores owned by the Company. The Company operates through three segments: Domestic Company Stores, Domestic Franchise, and International. Its Domestic Franchise segment consists of its domestic franchised stores, which represent its system-wide stores and derives its revenues from franchise and development fees and the collection of franchise royalties from the Company's franchise owners located in the United States. The Domestic Company Stores segment consists of its Company-owned stores in the United States and derives its revenues from retail sales of pizza and side items to the general public. Its International segment consists of its stores outside of the United States, all of which are franchised and derives its revenues from franchise and development fees and the collection of franchise royalties from franchises located outside the United States.

23.     MTY, is a Canada-based company, which franchises and operates quick-service restaurants. The Company operates in four segments: Franchising, which includes revenue from royalties, supplier contributions, franchise fees, rent, and the construction and renovation of restaurants; Corporate, which includes the direct sale of prepared food to customers; Distribution, which includes distribution of raw materials to restaurants of its Valentine and Franx banners; and processing, which includes the sale of ingredients and prepared food to restaurant chains,

distributors and retailers. The Company's quick-service restaurants operate under various banners, such as Tiki-Ming, Sukiyaki, La Cremiere, Au Vieux Duluth Express, Carrefour Oriental, Panini Pizza Pasta, Franx Supreme, Croissant Plus, Villa Madina, Cultures, Thai Express, Vanellis, Kim Chi, Yogen Fruz, Sushi Shop, Koya Japan, Vie & Nam, Tandori, O'Burger, Tutti Frutti, Taco Time, Country Style, Buns Master, and Valentine.

24.     On April 11, 2019, MTY issued a press release announcing the Proposed Transaction. The press release stated in relevant part:

### MTY Food Group Inc. and Papa Murphy's Holdings, Inc. Announce Definitive Merger Agreement

**MONTREAL, April 11, 2019 –** MTY Food Group Inc. ("MTY") (TSX:MTY) and Papa Murphy's Holdings, Inc. ("Papa Murphy's") (NASDAQ:FRSH) today announced they have entered into a definitive merger agreement (the "Merger Agreement") under which MTY would acquire all of the issued and outstanding shares of common stock of Papa Murphy's for cash consideration of US$6.45 per share, representing total transaction value of approximately US$190.0 million (C$253.2 million) (the "Transaction"), including Papa Murphy's net debt outstanding. The purchase price per share of Papa Murphy's common stock implies a premium of 31.9% to the Papa Murphy's closing price on April 10, 2019 and 46.3% to the unaffected Papa Murphy's closing price on November 7, 2018 prior to the announcement by Papa Murphy's that it was conducting a process to explore and evaluate strategic alternatives to maximize shareholder value and had engaged a financial advisor to assist with the review. The terms and conditions of the Merger Agreement were unanimously approved by the boards of directors of both companies. The Transaction is subject to customary closing conditions including receipt of applicable regulatory approvals.

MTY is a leading franchisor in the North American restaurant industry. MTY's multi-concept model allows MTY to position itself across a broad range of demographic, economic and geographic sectors. As at February 28, 2019, its network had 5,941 locations in operation, mostly all franchised, including over 500 locations operating in 39 countries outside North America.

Papa Murphy's is a franchisor and operator of the largest Take 'n' Bake pizza brand and the 5th largest pizza chain in the United States, selling fresh, hand-crafted pizzas ready for customers to bake at home. In addition to scratch-made pizzas, Papa Murphy's offers a growing menu of grab 'n' go items, including salads, sides and desserts. Papa Murphy's was founded in 1981 and operated 1,331 franchised and 106 corporate-owned stores in 37 U.S. states, Canada and the United Arab Emirates as of December 31, 2018.

Eric Lefebvre, Chief Executive Officer of MTY said, "This is an important transaction for MTY as we add a brand with a differentiated position in pizza to our existing U.S. portfolio. We are thrilled about the prospect of welcoming the Papa

Murphy's brand, its franchise partners and employees, to the MTY family. Papa Murphy's is a unique concept with over a 35 year history of providing a superior quality product made with fresh ingredients. We believe the pizza segment is highly attractive due to its size, fragmented nature and growth potential. The Papa Murphy's brand is well loved by its loyal customers and is supported by a strong network of franchise partners. We expect the combination of these two companies and the expertise it brings to produce tremendous opportunities for MTY's U.S. expansion objectives."

"The board of directors and our advisors have thoroughly evaluated all options available to us and are confident that this agreement provides immediate value to our stockholders at a premium over our current share price. Merging our unique, differentiated brand with a global leader in franchised restaurant concepts will accelerate on-going efforts to enhance our convenience and relevance and maintain our position as the number one Take 'n' Bake pizza chain in the United States." said Jean Birch, Chairperson of the board of directors of Papa Murphy's.

**Transaction Highlights**

- Strengthens MTY's leading portfolio of brands through the acquisition of the 5th largest pizza chain in the U.S.

    - Leading Take 'n' Bake pizza concept serving award-winning, superior quality products made with fresh ingredients.

    - Increasing MTY's exposure to the robust and growing U.S. pizza market.

    - MTY's combined network to have approximately 7,378 stores globally after completion of the Transaction with future runway for growth.

- Complements MTY's U.S. operations and reduces seasonality of its results.

    - Papa Murphy's had US$809 million System-wide Sales for the twelve-month period ended December 31, 2018.

    - Papa Murphy's generated US$22.3 million in Adjusted EBITDA for the twelve-month period ended December 31, 2018.

- Strategically timed as Papa Murphy's system is building momentum after implementation of refreshed corporate strategy and refocus on the brand.

    - MTY anticipates working with Papa Murphy's to make capital investments focused on growing top line sales and increasing franchise partner profitability.

- MTY welcomes a seasoned management team and looks forward to building on Papa Murphy's employees' expertise and maintaining the current support center in Vancouver, WA.

- Expected to be immediately accretive to MTY's EBITDA and cash flow per share.

- MTY remains committed to pursuing its acquisition strategy. Pro Forma MTY is expected to continue to generate significant cash flow allowing for deleveraging and providing liquidity to pursue future M&A opportunities.

**Transaction Details**

Under the terms of the Merger Agreement, a subsidiary of MTY will commence a tender offer to purchase all of the outstanding shares of Papa Murphy's common stock for US$6.45 per share in cash. The closing of the tender offer is subject to customary conditions, including antitrust clearance and the tender of a majority of the outstanding shares of Papa Murphy's common stock. Following successful completion of the tender offer, MTY would acquire all remaining shares not tendered in the offer through a merger at the same price as in the tender offer.

The Transaction is not subject to any financing condition and consideration will be 100% funded in cash. MTY will use its cash on hand and its existing credit facility to fund the cash consideration and to repay Papa Murphy's net debt outstanding as of the close of the Transaction, which today is approximately US$77.4 million.

Pursuant to the terms of the Merger Agreement, Papa Murphy's has agreed that it will not solicit or initiate discussions regarding any other business combination or sale of material assets. MTY has the right to match any superior proposals. The Transaction provides for a termination fee of approximately US$5.7 million payable by Papa Murphy's to MTY in certain circumstances if the Transaction is not completed.

The Transaction is expected to close in the second calendar quarter of 2019. There is no assurance the Transaction will be completed as described above or at all, or that the anticipated closing date will materialize. Following the close of the transaction, Papa Murphy's will be a wholly-owned subsidiary of MTY and will continue to be operated as an independent brand.

**Transaction Approvals**

The Transaction has been unanimously approved by the board of directors of MTY and has been unanimously approved by the board of directors of Papa Murphy's. Each director and executive officer of Papa Murphy's, cumulatively having beneficial ownership and control over 2.2% of Papa Murphy's shares outstanding, have signed support agreements to tender all of their shares into the offer. Moreover, certain additional Papa Murphy's shareholders having beneficial ownership and control over 49.8% of Papa Murphy's shares outstanding have also signed such agreement to tender all of their shares into the offer. In total, holders of approximately 52.1% of Papa Murphy's shares have agreed to tender their shares into the offer, subject to potential adjustments in certain circumstances provided in the support agreement. The consummation of the Transaction is conditioned upon the tender of a majority of Papa Murphy's issued and outstanding shares of common stock.

**Financial and Legal Advisors**

National Bank Financial Inc. is acting as exclusive financial advisor to MTY and Fasken Martineau DuMoulin LLP and Morrison & Foerster LLP are acting as its legal advisors. North Point Advisors LLC is acting as exclusive financial advisor

to Papa Murphy's and Perkins Coie LLP is acting as its legal advisor.

25.     The Offer Price is inadequate consideration for Papa Murphy's shareholders and does not reflect fair value for the Company. In fact, the $6.45 Offer Prices represents a derisory 4% premium to the Company's trading price less than a month earlier on March 14, 2019. Moreover, a superior offer to the Offer Price existed as "Company A" offered $6.64 per share to purchase the Company. Further, the Recommendation Statement concedes that the Company's executive officers and the members of the Board have interests in the Proposed Transaction "that are different from, or in addition to, those of the Company's other stockholders." Recommendation Statement at 29. These interests include, but are not limited to, affiliations with various hedge funds or similar financial entities whose interests differ from Papa Murphy's common shareholders, lucrative golden parachute compensation, continued employment, and vesting of stock options that would result from the consummation of the Proposed Transaction. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Recommendation Statement, which is necessary for shareholders to make an informed decision on whether to tender their shares in the Tender Offer.

## II.     The Recommendation Statement Is Materially Incomplete and Misleading

26.     On April 25, 2019, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC.  The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Recommendation Statement misrepresents or omits material information that is necessary for Papa Murphy's shareholders to make an informed

decision concerning whether to tender their shares, in violation of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9.

27.     First, the Recommendation Statement omits critical financial projections, including Papa Murphy's unlevered free cash flow projections for both the management and the base case projections (the "Cash Flow Projections").   As stated in the Recommendation Statement, to perform its *Discounted Cash Flow Analysis* of Papa Murphy's, North Point utilized projections for Papa Murphy's unlevered free cash flow from both cases through 2023. It is indisputable that the Cash Flow Projections were the most important input in North Point's *Discounted Cash Flow Analysis*—the entire analysis is based upon discounting the Cash Flow Projections to present value.  However, Defendants elected to exclude the Cash Flow Projections from the Recommendation Statement, despite the fact that they simultaneously elected to include a purported "summary" of North Point's *Discounted Cash Flow Analysis* and the Company Forecasts.

28.     Defendants elected to summarize the projections for Papa Murphy's in the Recommendation Statement, but they excised and failed to disclose the most important projections—the Cash Flow Projections. The omission of the Cash Flow Projections renders the projection table on page 43 of the Recommendation Statement incomplete and misleading because, without the Cash Flow Projections, the projection summaries provide a misleading overall valuation picture of the Company. This is caused by significant differences between unlevered free cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the EBITDA projections that were included in the Recommendation Statement.

29.     EBITDA projection metrics are not sufficient analogs for cash flow projections.

Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] North Point agrees, as indicated by their use of the Cash Flow Projections—not EBITDA—in performing their *Discounted Cash Flow Analysis*, and academics and practitioners concur.[2,3,4] As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[5] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[6] As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

---

[1]      Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2]      "Morningstar's Approach to Equity Analysis and Security Valuation." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305. ("We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise.").

[3]      Copeland, Thomas. *Financial Theory and Corporate Policy*. 3rd ed. 24. ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").

[4]      Brealey, Richard, Stewart Myers, and Franklin Allen. "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80. ("This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows…. Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share.") (emphasis in the original).

[5]      Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[6]      Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

30.     Therefore, by disclosing the EBITDA figures in the Recommendation Statement and withholding the Cash Flow Projections, Defendants render the table of projections on page 43 of the Recommendation Statement materially incomplete and provide a misleading valuation picture of the Company.  Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

31.     If a Recommendation Statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by North Point, but have omitted the Cash Flow Projections. Thus, their omission renders the projections disclosed on page 43 and the summary of North Point's *Discounted Cash Flow Analysis* misleading.

32.     Second, the Recommendation Statement describes North Point's fairness opinion and the various valuation analyses performed in support of its opinion.  Defendants concede the materiality of this information in citing North Point's fairness opinion among "the material information and factors and analyses considered by the Board in reaching its recommendation." Recommendation Statement at 30. However, the description of North Point's fairness opinion and analyses fails to include key inputs and assumptions underlying the analyses.  Without this information, as described below, Papa Murphy's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, *if any*, to place on North Point's fairness opinion in determining whether to tender their shares in the Tender Offer. This omitted information, if disclosed, would significantly alter the total mix of information available to Papa

Murphy's shareholders.

33.     With respect to North Point' *Comparable Precedent Transaction Analysis*, the Recommendation Statement fails to disclose the individual multiples for each transaction utilized in the analysis. A fair summary of a transactions analysis requires the disclosure of the individual multiples for each transaction—as clearly demonstrated in summary of the similar *Comparable Public Trading Multiple Analysis* directly preceding the transactions analysis. Merely providing the range of values, or the means or medians, that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to present the Offer Price in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Recommendation Statement misleading.

34.     Similarly, the Recommendation Statement purports to summarize the *Premiums Paid Analysis* performed by North Point without identifying the individual transactions or premiums. For the same reasons as stated in connection with the transactions analysis, shareholders are unable to assess whether the banker calculated appropriate premiums, or, instead, applied unreasonably low premiums in order to present the Offer Price in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Recommendation Statement misleading.

35.     Additionally, in summarizing North Point' *Discounted Cash Flow Analysis* the Recommendation Statement fails to disclose the following key components used in its analysis— in addition the Cash Flow Projections—that must be disclosed for shareholders to comprehend the analyses: (i) the inputs and assumptions underlying the calculation of the discount rate range of 11.4% to 16.4%, (including WACC and CAPM components); (ii) the inputs and assumptions

underlying the selection of the 7.5x to 9.5x EBITDA exit multiples used to derive the terminal values; and (iii) the actual terminal values North Point calculated.

36.     These key inputs are material to Papa Murphy's shareholders, and their omission renders the summary of North Point' *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles explaining the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions: in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> *There* is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).

37.     This information is particularly important here given the degree of the variation in the applied discount rate range—normally discount rate ranges will vary 1%-2%, whereas here, the discount rate varies 5%—and in light of the fact that North Point already manipulated the

undisclosed Cash Flow Projections.[7] Without the Cash Flow Projections and the above-mentioned information, Papa Murphy's shareholders cannot evaluate for themselves the reliability of North Point's *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value per share range reflects the true value of the Company or was the result of North Point's unreasonable judgment, and make an informed decision regarding whether to tender their shares in the Tender Offer.

38.     Third, with respect to the *Background of the Offer*, the Recommendation Statement states that Papa Murphy's and 72 parties entered into non-disclosure agreements, but fails to disclose whether these agreement contained a standstill provision and/or a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Transaction Agreement or were still in effect. On page 3 the Recommendation Statement states the non-disclosure agreement between Papa Murphy's and MTY contained a "customary" standstill provision with a term of two years—well beyond the horizon of the sales process. This indicates that not only standstill provisions existed, but that they did not fall away upon the execution of the Merger Agreement.

39.     Accordingly, the express communication of the existence of such provisions is material to Papa Murphy's shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal.  The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. If those non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal

---

[7]     It should be noted that even after these manipulations, the $6.45 Offer Price just barely fits into the range of fairness: $6.28 to $12.34.

by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the non-disclosure agreements the Company entered into in the *Background of the Offer* section of the Recommendation Statement misleading. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

40.    Additionally, the Recommendation Statement reveals that members of the Board have equity interests and stock options in the Company, but fails to disclose the amount each Board member stands to receive upon the consummation of the Proposed Transaction, including the amounts that some of their affiliated financial entities stand to receive. The interests of director in a transaction is information that would undoubtedly be useful for a shareholder when deciding the fairness of that transaction. Therefore, the omission of this material information renders the corresponding disclosures in the Recommendation Statement misleading.

41.    Finally, the Recommendation Statement discloses that several of Papa Murphy's high-ranking executive officers—including Individual Defendant Spangler—entered into Retention Agreements with MTY. However, the Recommendation Statement fails to disclose the timing and nature of the negotiations surrounding these agreements. Continued employment, and the negotiation thereof, represents a conflict of interest of which Papa Murphy's shareholders must be made aware. Once a recommendation statement travels down the road of partial disclosure of the history leading up to a merger agreement, the duty of disclosure requires Defendants to provide shareholders with an accurate, full, and fair characterization of those historic events. Accordingly, the failure to disclose complete and accurate details informing shareholders of the precise timing and nature of the employment negotiations renders the

statements describing these agreements and the summary of the sales process misleading.

42.     In sum, the omission and/or misstatement of the above-referenced information renders statements in the Recommendation Statement materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and other Papa Murphy's shareholders will be unable to make a fully-informed decision regarding whether to tender their shares, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## **COUNT I**
### **(Against All Defendants for Violation of Section 14(e) of the Exchange Act)**

43.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

44.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

45.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information

about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

47.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

48.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholders would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

49.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

50.     The misrepresentations and omissions in the Recommendation Statement are

material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed

decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## <u>COUNT II</u>
**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

52.     Defendants have caused the Recommendation Statement to be issued with the

intention of soliciting shareholder support of the Proposed Transaction.

53.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated

thereunder require full and complete disclosure in connection with tender offers.  Specifically,

Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security
> to accept or reject a tender offer or request or invitation for tenders
> shall be made in accordance with such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

54.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any
> solicitation or recommendation to holders of a class of securities
> referred to in section 14(d)(1) of the Act with respect to a tender
> offer for such securities shall include the name of the person making
> such solicitation or recommendation and the information required
> by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair
> and adequate summary thereof.

55.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to
> make the required statements, in light of the circumstances under

which they are made, not materially misleading.

56.     The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the omitted information.

57.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, that render the Recommendation Statement misleadingly incomplete.  Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

58.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

### COUNT III
**(Against all Defendants for Violations of Section 20(a) of the Exchange Act)**

59.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Papa Murphy's within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Papa Murphy's, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements

contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

63.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.     As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages

C.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 1, 2019              **MONTEVERDE & ASSOCIATES PC**

By: *_/s/ Juan E. Monteverde_____*
    Juan E. Monteverde (JM-8169)
    The Empire State Building 350 Fifth
    Avenue, Suite 4405 New York, NY 10118
    Tel: (212) 971-1341
    Fax: (212) 202-7880
    Email: jmonteverde@monteverdelaw.com

    *Attorneys for Plaintiff*